IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY

| | | |
|---|---|---|
| JANE DOE<br>3700 Toone Street<br>Baltimore, Maryland 21224 | * | |
| Plaintiff, | * | |
| v. | * | Case No.: |
| OFFICE OF THE PUBLIC DEFENDER OF MARYLAND<br>6 St. Paul Street<br>Suite 1400<br>Baltimore, Md 21202<br>Serve:<br>    Dereck E. Davis<br>    Treasurer, State of Maryland<br>    80 Calvert St.<br>    Annapolis, Md. 21401 | * | C-15-CV-25-000307 |
| and | * | |
| NATASHA DARTIQUE<br>Public Defender<br>6 St. Paul Street<br>Suite 1400<br>Baltimore, Md 21202 | * | |
| Defendants. | * | |

........................................................................

MOTION FOR LEAVE TO FILE COMPLAINT UNDER PSEUDONYM

Plaintiff Jane Doe, by her undersigned counsel, hereby moves for leave to proceed under a pseudonym in the proceedings on her Complaint, filed today under seal, against The Office of the Public Defender and Natasha Dartique.

Plaintiff brings claims for common law defamation and violations of her federal and state constitutional rights to due process and violations of her protected liberty interest in her

reputation. The claims are based on Defendants disseminating false, highly stigmatizing communications regarding plaintiff which have caused and continue to cause profound, irreparable damage to plaintiff's reputation and career. The claims are of a highly sensitive and personal nature, and to proceed using her full name would only spread the false, highly stigmatizing communications, causing further harm.

     Wherefore, Plaintiff respectfully moves that she be granted leave to pursue her claims under the pseudonym of Jane Doe, and that she be granted such additional relief as the Court deems just.

        _____/S/_____
Kathleen Cahill
AIS/CPF #8212010054
The Law Offices of
     Kathleen Cahill, LLC
1 Olympic Place
Suite 900
Towson, MD 21204
410-321-6171
kathleen@kathleencahill-law.com

Attorney for Plaintiff

IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY

| | | |
|---|---|---|
| JANE DOE<br>3700 Toone Street<br>Baltimore, Maryland 21224 | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | Case No.: |
| OFFICE OF THE PUBLIC DEFENDER OF MARYLAND<br>6 St. Paul Street<br>Suite 1400<br>Baltimore, Md 21202<br>Serve:<br>    Dereck E. Davis<br>    Treasurer, State of Maryland<br>    80 Calvert St.<br>    Annapolis, Md. 21401 | *<br>*<br>*<br>*<br>* | C-15-CV-25-000307 |
| and | * | |
| NATASHA DARTIQUE<br>Public Defender<br>6 St. Paul Street<br>Suite 1400<br>Baltimore, Md 21202 | *<br>*<br>* | |
| Defendants. | * | |

....................................................................

MEMORANDUM IN SUPPORT OF
MOTION FOR LEAVE TO FILE COMPLAINT UNDER PSEUDONYM

Plaintiff Jane Doe, by her undersigned counsel, hereby moves that she be granted leave to proceed under a pseudonym in the proceedings on her Complaint, filed under seal, against The Office of the Public Defender and Natasha Dartique.

Plaintiff brings claims for defamation and violations of her federal and state constitutional rights to due process and violations of her protected liberty interest in her reputation. The claims are based on Defendants disseminating false, highly stigmatizing communications regarding plaintiff. Defendants' communications have caused and continue to cause profound, irreparable damage to plaintiff's reputation and career.

The court has discretion to grant leave for a plaintiff to proceed under a pseudonym in exceptional circumstances involving matters of a highly sensitive and personal nature, or where the injury litigated against would be incurred or exacerbated as a result of the disclosure of the plaintiff's identity. See Bennett v. Porter, No. 1092, Sept.term,2021, 2022 WL 1939831, at *4 (Md. Ct. Spec. App. June 3, 2022). Here, there is a compelling governmental interest to exercise that discretion in that if plaintiff were to have to engage in public proceedings using her full name, the litigation would by necessity entail further spread of Defendants' false, highly stigmatizing communications thereby causing additional injury to plaintiff.

Wherefore, Plaintiff respectfully moves that she be granted leave to pursue her claims under the pseudonym of Jane Doe, and that she be granted such additional relief as the Court deems just.

                                                            _____/S/_____
Kathleen Cahill
AIS/CPF #8212010054
The Law Offices of
      Kathleen Cahill, LLC
1 Olympic Place
Suite 900
Towson, MD  21204
410-321-6171
kathleen@kathleencahill-law.com

Attorney for Plaintiff

Case 8:25-cv-00717-PX     Document 6     Filed 03/05/25     Page 5 of 20



In re: ███████████

McCammon Case Number: 00119305

# HEARING OFFICER'S DECISION

The instant case arises from the termination of the at-will employment contract of ███████ ████, a law clerk for the Office of the Public Defender ("OPD"). Ms. ████ claims that the charges leading to such termination were baseless and that her reputation was seriously damaged by the conduct and communications of the OPD regarding such termination. The OPD claims that the charges are not baseless, that Ms. ████'s reputation has not been damaged by the OPD, and that Ms. ████ is not foreclosed from employment opportunities in the legal profession. Because Ms. ████ has a constitutionally protected liberty interest in her reputation and was given no opportunity by the OPD to respond to the charges, the parties have agreed to a Name Clearing Hearing before an impartial tribunal for the purpose of giving Ms. ████ the opportunity to refute the charges and clear her name.

The parties agreed that the Name Clearing Hearing would be conducted under the auspices of The McCammon Group, Ltd. with the undersigned as the Hearing Officer. The hearing was held on October 14, 2024, with Ms. ████ represented by Kathleen Cahill, Esq. of Kathleen Cahill, LLC, and Andrew J. Graham, Esq. of Kramon & Graham, P.A., and the OPD represented by Donald E. Zaremba, Esq., OPD General Counsel, and Matthew Fraling, Esq., OPD General Counsel. Eight witnesses testified at the hearing: ████████; Paul Manrique, Associate Dean for Student Affairs, University of Baltimore School of Law; Maureen Rowland, Esq., OPD; ████████, boyfriend of Ms. ████; ████████, Ms. ████'s mother; Janine Meckler, Esq., OPD and Ms. ████'s supervisor; Natasha Dartigue, Esq., State Public Defender; and Dawn Kouneski, Human Resources Director for OPD. Prior to the hearing, Ms. ████'s counsel submitted twenty-one exhibits and counsel for OPD submitted eleven exhibits. Post-hearing memoranda, including three additional exhibits from Ms. ████'s counsel, were

provided on November 8, 2024. Upon consideration of the testimony, exhibits, and post-hearing briefs, the Hearing Officer sets forth herein his findings of fact and conclusions of law.

## **FINDINGS OF FACT**

(A) Background

Ms. ▓▓▓ started law school at the University of Baltimore School of Law in August 2022. Ms. ▓▓▓ chose UB Law in part due to its highly rated clinical programs in criminal law, as it was her career plan to become a public defender.

In May 2023, Ms. ▓▓▓ started an unpaid summer clerkship at the OPD. In August 2023, Ms. ▓▓▓ began an externship at the OPD, that is, a clerkship for which she also earned academic credit at UB Law. That unpaid externship was slated to extend through the semester until November 2023. However, in October 2023, Ms. ▓▓▓'s supervising attorney, Janine Meckler, advised her that she was recommending Ms. ▓▓▓ for a newly funded paid law clerk role. Effective October 25, 2023, Ms. ▓▓▓ was awarded that new paid law clerk position, and she was provided a Personal Services Contract through June 30, 2024.

Under the Personal Services Contract, Ms. ▓▓▓ was "employed as a contractual employee," "not a Maryland State Employee," and was "not covered by the Merit system of the [State Personnel and Pensions Article ('SPP')], nor Title 12 of the SPP or any other similar rights or protection afforded to non-contractual employees of the State." Article XII of the contract states: "This Contract is an 'at-will' employment contract. As such, the [OPD] may, in its sole discretion and without cause, terminate this Contract at any time."

On November 29, 2023, Ms. ▓▓▓ received a satisfactory evaluation from Ms. Meckler. On January 30, 2024, Ms. ▓▓▓ received another satisfactory evaluation from Ms. Meckler. Starting in November 2023, Ms. Meckler raised the likelihood of Ms. ▓▓▓ securing a law clerk position for her final year of law school that would also make her a preferred candidate for employment with the OPD after her May 2025 graduation. Those discussions continued throughout the ensuing months, and Ms. Meckler continuously conveyed her

2

encouragement and support for Ms. ▇▇▇ achieving that placement. Those favorable discussions continued as late as March 8, 2024, just ten days prior to Ms. ▇▇▇'s discharge.

Ms. ▇▇▇ loved her work at the OPD; she was proud that her hard work and accomplishments were being recognized; and she was thrilled at the prospect of fulfilling her career ambition of becoming a public defender.

(B) The Termination

On March 1, 2024, Ms. ▇▇▇ approached Ms. Meckler to tell her about a conversation that she had overheard between Matt Connell, an OPD attorney, and an unidentified law clerk. In the conversation, the law clerk complained to Mr. Connell that she did not have an opportunity to work with him because another law clerk and a paralegal were always working with him. Ms. ▇▇▇ told Ms. Meckler that Mr. Connell was upset that he was assigned to work with a law clerk that he didn't want to work with, which clerk was Ms. Meckler's daughter. When Ms. Meckler later confronted Mr. Connell about Ms. ▇▇▇'s reporting of the overheard conversation, Mr. Connell claimed that such conversation never occurred.

Mr. Connell then advised Ms. Meckler that Ms. ▇▇▇ "'stalks' him as she seems to know when he gets off the elevator and then follows him to his office to talk to him and try to get him to work with her. He is uncomfortable around her and does not trust her. She has invited herself to join his jail visits despite him going with another clerk." According to Ms. Meckler, Mr. Connell's March 1 complaint was the first time that she had heard that Mr. Connell was bothered by Ms. ▇▇▇'s behavior.

Because Ms. Meckler did not believe that Mr. Connell was in any danger from Ms. ▇▇▇, she did not take any action until a week later (March 8, 2024) when she called the OPD Human Resources Director, Dawn Kouneski. Ms. Meckler also never spoke to Ms. ▇▇▇ about Mr. Connell's concerns regarding her behavior.

In the March 8 conversation, Ms. Meckler told Ms. Kouneski that an unnamed law clerk "was following around a particular attorney and that attorney was uncomfortable working around that." Ms. Meckler did not identify the attorney or law clerk. Other than telling Ms. Meckler to

3

follow up in writing with the names of the attorney and law clerk, Ms. Kouneski took no action. Ms. Meckler did not contact Ms. Kouneski again until a week later on March 15, 2024.

In the morning of March 15, 2024, Ms. Meckler received a telephone call from Mr. Connell, who told her that when he was checking Ms. ▮▮▮'s desk the night before looking for an unused flash drive, he discovered three unfired hollow point bullets in one of the drawers. Ms. Meckler went to Ms. ▮▮▮'s office and found the bullets neatly lined up in a small compartment. She removed the bullets, placed them in a sandwich bag, and put them in her office.

In the afternoon of March 15, Ms. Meckler sent an email to Ms. Kouneski in which she advised Ms. Kouneski of the "stalking" allegations made by Mr. Connell against Ms. ▮▮▮ and the discovery of the bullets. In the email, Ms. Meckler expressly stated that neither she nor Mr. Connell were "seeking Ms. ▮▮▮'s termination." Later that afternoon, Ms. Kouneski forwarded Ms. Meckler's email to District Public Defender Marguerite Lanaux and State Public Defender Natasha Dartigue.

At around 5:15 p.m. on March 15, a meeting was held with Ms. Meckler, Ms. Kouneski, Ms. Lanaux, and Ms. Dartigue in attendance. Because of the allegations of "stalking," the presence of the bullets in Ms. ▮▮▮'s desk, and a concern for the safety of Mr. Connell and the other employees of OPD, Ms. Dartigue decided to terminate Ms. ▮▮▮'s contract of employment effective the following Monday, March 18. Ms. Kouneski did not recommend that an investigation be conducted, and none was done. Ms. Kouneski also did not recommend that someone talk to Ms. ▮▮▮ and no one did prior to March 18.

On March 18, 2024, Ms. ▮▮▮ received notice of a Zoom call with Ms. Lanaux and another member of leadership. Ms. ▮▮▮ believed that the call was to convey that she was receiving the coveted offer for her third year of law school. But when Ms. ▮▮▮ logged onto the call, she was told that she was fired effective immediately and that no reason would be provided. Ms. ▮▮▮ was stunned. She pressed for information as to why, but they refused to provide any details. A letter, dated March 18, was sent to Ms. ▮▮▮, signed by Ms. Kouneski, which stated, in relevant part:

> As you were advised in your meeting with District Public Defender, Marguerite Lanaux, your Student Technical Assistant contract will terminate effective **March 29, 2024**. You

4

will continue to be on OPD payroll through this date, however, today, **March 18, 2024,** will be your last day. Marguerite Lanaux will mail your personal belongings to the address confirmed with you. As of March 18, 2024, do not return to any OPD offices.

(C) The Charges

The Hearing Officer recognizes that under Ms. ▓▓▓'s contract of employment, the OPD may "in its sole discretion and without cause, terminate this Contract at any time." Nevertheless, the Hearing Officer finds that the OPD based such termination on three charges: (1) Ms. ▓▓▓'s possession of three unfired nine-millimeter hollow point bullets in her desk on OPD office property; (2) Ms. ▓▓▓'s alleged "stalking" of Mr. Connell; and (3) a concern of a potential threat of violence by Ms. ▓▓▓ toward Mr. Connell or other OPD employees.

1. <u>The Bullets.</u> It is undisputed that three unfired nine-millimeter hollow point bullets were found on the evening of March 14, 2024, in a desk located in an office assigned solely to Ms. ▓▓▓. There is no evidence that Ms. ▓▓▓ owned the bullets or brought the bullets into the OPD office. The OPD claims that because Ms. ▓▓▓ had knowledge of the bullets in her desk drawer, she was in possession of them. Ms. ▓▓▓ admits that she knew of the presence of the bullets in her desk, but asserts that she was directed by Ms. Meckler to leave the bullets there.

Ms. ▓▓▓ testified that she found the bullets in the desk to which she was assigned in June or July 2023. When she discovered the bullets, Ms. ▓▓▓ called her boyfriend, ▓▓▓ ▓▓▓, to come to her office to see what she had found. He did so and confirmed that they were hollow point bullets. Mr. ▓▓▓'s testimony corroborated these events. So, too, did the testimony of Ms. ▓▓▓'s mother. Mrs. ▓▓▓ testified that in one of Ms ▓▓▓'s frequent telephone calls, Ms. ▓▓▓ told her that she had found bullets in her assigned desk, that she had asked Mr. ▓▓▓ to come to her office to see what she had found, and that he confirmed that they were in fact bullets. The Hearing Officer finds that the testimonies of Ms. ▓▓▓, Mr. ▓▓▓, and Mrs. ▓▓▓ regarding the discovery of the bullets in Ms. ▓▓▓'s desk in June or July of 2023 to be credible.

Maureen Rowland, an OPD attorney, testified that she had been assigned the office and desk immediately prior to Ms. ▓▓▓. She stated that in the summer of 2023 she was asked if a law clerk could use her office because she rarely came into the office. Ms. Rowland agreed, and

5

Ms. ████ was the law clerk assigned to the office. Ms. Rowland testified further that she often met clients in her office prior to going to the courthouse. Because there was no metal detector in the building, Ms. Rowland's clients would have "stuff in their pockets," such as knives, bullets, and other contraband. Ms. Rowland stated that she would put these items in her desk to hold for the client while they went to the courthouse, and then "they would just come back to my office and get it." She also said that her husband was a police officer. The Hearing Officer finds this testimony of Ms. Rowland to be credible.

Ms. ████ also testified that upon her discovery of the bullets in the desk, she went and informed Ms. Meckler, whereupon Ms. Meckler told her that they probably belonged to the previous occupant of the desk, Ms. Rowland, whose ex-husband (actually separated husband) was a police officer, apparently indicating that Ms. Rowland could have obtained the bullets from him. Ms. ████ testified that Ms. Meckler told her to leave the bullets there because the OPD was moving out of the offices soon.

Ms. ████'s account of her conversation with Ms. Meckler in June or July about discovering the bullets and Ms. Meckler's responsive comments was corroborated by Mr. ████ and Mrs. ████. Both Mr. ████ and Mrs. ████ testified that Ms. ████ subsequently conveyed to them what had transpired when she told Ms. Meckler about the bullets – that Ms. Meckler said that they were probably Ms. Rowland's and to leave them there because the offices were moving soon.

Ms. Meckler testified that the conversation with Ms. ████ about the bullets "never happened," that she did not know of the existence of the bullets before March 15, 2024, and that she would never have told Ms. ████ to just leave the bullets in the desk, "Absolutely not." Ms. Meckler also testified that when she found the bullets in Ms. ████'s desk, she was "scared," "unnerved," and "really freaked" out by the fact that they were hollow point bullets.

Ms. Meckler testified that after taking the bullets from Ms. ████'s desk, she called Ms. Rowland and asked whether she ever had bullets in her desk, to which Ms. Rowland laughed and said, "no." In her testimony, Ms. Rowland admitted that she said "no," but denied saying that she never had bullets in her desk. Ms. Rowland explained that her answer, "no," was a "knee jerk reaction," and she didn't know "one way or the other" whether the bullets were in her desk. She said that the bullets could have been in her desk.

6

Whether or not Ms. Meckler told Ms. ███ to leave the bullets in her desk goes to the heart of the OPD's charge against Ms. ███. Upon consideration of all of the evidence on this charge, the Hearing Officer finds that Ms. Meckler did in fact direct Ms. ███ to keep the bullets in her desk. The Hearing Officer makes this finding for three reasons. First, Ms. ███'s actions were consistent with her views toward guns. She testified that she had never owned a gun, never fired a gun, never used a gun, never touched a bullet or a gun, and called Mr. ███ to come to her office to make sure they were in fact bullets. Ms. ███ also said that she was "very against guns, very pro gun reform," and attended a March for Our Lives gun reform rally in Denver, as evidenced by a photo of Ms. ███, her mother, and her sister at that rally. Ms. ███'s actions - confirming the suspected bullets as real bullets, advising her supervisor of her discovery, and following her supervisor's instructions - are entirely consistent with her anti-gun views.

Second, the keeping of the three unfired hollow point bullets in her desk without the knowledge and direction of her supervisor would be entirely inconsistent with Ms. ███'s career goal of becoming a public defender. Ms. ███ testified that she was known among her fellow law students as "Miss OPD" and that any student interested in pursuing a career at the OPD, or thinking of a career in criminal defense, was told to talk to her. She also indicated that she had no career goal other than becoming a public defender. As stated above, Ms. Meckler had expressed encouragement and support for Ms. ███ securing a law clerk position with the OPD for her last year of law school and thereby becoming a preferred candidate for employment by the OPD upon graduation. It is inconceivable that Ms. ███ would risk her single-minded career goal by keeping bullets in her desk without the knowledge and direction of her supervisor.

Last, the reasons given by Ms. Meckler for Ms. ███ to keep the bullets in her desk, as stated by Ms. ███, are consistent with the facts. Ms. Meckler suggested that the bullets may have belonged to Ms. Rowland's husband, who is a police officer. Ms. Rowland's husband is in fact a police officer. Ms. Meckler also stated that Ms. ███ could leave the bullets in the desk because the OPD was moving out of its offices in the building soon. A recent article in the Baltimore Business Journal corroborates the move of the OPD offices from St. Paul Place to N. Charles Street in the coming months.

Therefore, the Hearing Officer concludes, and so finds, that ▓▓▓▓ has proven that she kept three unfired nine-millimeter hollow point bullets in her desk on OPD office property with the knowledge and at the express direction of her supervisor. Accordingly, the OPD charge that Ms. ▓▓▓▓ possessed unfired nine-millimeter hollow point bullets on OPD office property is baseless.

2. <u>Stalking.</u> There is no credible evidence that Ms. ▓▓▓▓ "stalked" Mr. Connell or otherwise engaged in any inappropriate conduct regarding Mr. Connell. Mr. Connell was the only person, other than Ms. ▓▓▓▓, who had personal knowledge of his interactions with Ms. ▓▓▓▓ and the OPD did not call him to testify at the hearing. Other than Ms. ▓▓▓▓'s emphatic denial of "stalking," the only evidence of "stalking" is the hearsay testimony of Ms. Meckler. And that evidence did not come close to the criminal or lay person concept of "stalking."

Ms. Meckler testified that she did not hear any complaint about Ms. ▓▓▓▓'s conduct from Mr. Connell until March 1, 2024, ten months after Ms. ▓▓▓▓ began working at the OPD. Ms. Meckler testified that Mr. Connell complained about Ms. ▓▓▓▓ not leaving him alone and about being uncomfortable around her. In her email to Ms. Kouneski, Ms. Meckler described Ms. ▓▓▓▓'s conduct as "she seems to know when [Mr. Connell] gets off the elevator and then follows him to his office to talk to him and to try to get him to work with her." Even when Ms. Meckler described the actions of an unnamed law clerk to Ms. Kouneski in a conversation on March 8, Ms. Kouneski described such actions as "the law clerk in question [] following around a particular attorney in the office and that attorney was uncomfortable working around that."

Any competent criminal defense attorney would know that "stalking" as a criminal offense involves an individual engaging in a "malicious course of conduct" that the individual knew or reasonably should have known would place the victim in reasonable fear of, among other things, serious injury, assault, death, or serious emotional distress. See MPJI-CR:4:31.1. For Mr. Connell to label Ms. ▓▓▓▓'s behavior as "stalking," and Ms. Meckler to repeat that label in her email to Ms. Kouneski, which was sent on to Ms. Dartigue, was a gross mischaracterization of Ms. ▓▓▓▓'s behavior, especially in light of the fact that Ms. ▓▓▓▓ was instructed to seek out work from attorneys to keep herself busy, and that neither Ms. Meckler nor Mr. Connell ever talked to Ms. ▓▓▓▓ about Mr. Connell's concerns. The Hearing

8

Officer credits Ms. ███'s testimony that she would never stalk anyone and that her conduct at the OPD was "nothing but respectful." The Hearing Officer also accepts the testimony of Ms. Meckler that Ms. ███ was "optimistic, eager, respectful, willing to please, eager to please" and was never "temperamental or explosive, or abusive." The Hearing Officer concludes, and so finds, that Ms. ███ never "stalked" Mr. Connell, or acted in any way other than professional, respectful, and eager to work with OPD attorneys, such as Mr. Connell. Accordingly, the Hearing Officer finds that the charge of "stalking" against Ms. ███ regarding her interactions with Mr. Connell is baseless.

    3. <u>Potential Threat of Violence.</u> On Monday, March 18, 2024, Ms. Dartigue contacted Dean Paul Manrique of the University of Baltimore School of Law to see if he would assist in returning Ms. ███'s personal belongings from her office at the OPD. According to Dean Manrique's testimony, in their telephone conversation Ms. Dartigue disclosed that Ms. ███ was going to be terminated for stalking an OPD attorney. When Dean Manrique inquired about a threat of violence, Ms. Dartigue responded that there was no direct threat of violence but "a concern of potential threat." Ms. Dartigue also told Dean Manrique that Ms. ███ had been banned from all OPD offices and that if she returned to the office, a peace order would be sought. When Ms. Dartigue asked about any history of any similar sort of behavior, Dean Manrique said that Ms. ███ "was a standout student leader at the law school and there had been no concerns about her in the past."

    Although Ms. Dartigue testified that she did not share any reason for Ms. ███'s termination with Dean Manrique and that she did not have any information to share with him regarding any threat of violence, the Hearing Officer credits Dean Manrique's testimony on this subject. Dean Manrique prepared contemporaneous notes of his conversation on a Compass Case Management Submission Form while Ms. Dartigue did not make any notes. There is no way that Dean Manrique would have known of the allegations of "stalking" or a potential threat of violence but for his conversations with Ms. Dartigue. Finally, the first time that Ms. ███ learned of the charge of stalking was in a conversation with Dean Manrique a day or two after her termination.

    In her email of March 15 to Ms. Kouneski, Ms. Meckler stated that, even with the allegations of "stalking" and possessing of unfired hollow point bullets, neither Mr. Connell nor

9

Ms. Meckler sought Ms. ▓▓▓'s termination. It logically follows that neither Mr. Connell nor Ms. Meckler believed that Ms. ▓▓▓ posed a potential threat of violence. Indeed, Ms. Meckler testified that she did not believe that Mr. Connell was afraid of Ms. ▓▓▓ and she herself was not afraid of Ms. ▓▓▓. Similarly, Dean Manrique testified that he got to know Ms. ▓▓▓ as an incoming "1L," that she was an emerging leader from the start, and that she had been a student leader in the orientation program as a mentor two years in a row. Dean Manrique further testified that he did not believe that Ms. ▓▓▓ was a threat "based on any of the information that had been given to me from the public defender's office."

Upon consideration of all the evidence, the Hearing Officer concludes, and so finds, that Ms. ▓▓▓ did not pose any potential threat of violence, and that Ms. Dartigue's statements to the contrary lack any credible evidentiary foundation. Accordingly, the OPD's charge that Ms. ▓▓▓ posed a potential threat of violence is baseless.

(D) The Aftermath

As stated and found above, after the decision was made to terminate Ms. ▓▓▓'s employment contract, Ms. Dartigue contacted Dean Manrique and told him that (1) Ms. ▓▓▓'s employment as a law clerk was terminated because she "stalked" another OPD attorney; (2) there was a concern of a potential threat of violence by Ms. ▓▓▓; (3) Ms. ▓▓▓ was banned from all OPD offices; and (4) if Ms. ▓▓▓ came back to the office, the OPD would seek a peace order against her. As a result of his conversation with Ms. Dartigue, Dean Manrique documented the conversation and then notified Dean Ronald Weich, Associate Dean Joy Gaslovick, and Assistant Dean Dina Billian. Ms. Kouneski testified that Ms. Dartigue's disclosure to Dean Manrique of the reason for the termination of Ms. ▓▓▓'s employment and Ms. ▓▓▓ being a potential threat of violence was a violation of OPD Personnel Law and Maryland Personnel Law.

The OPD took additional measures as a result of the decision to terminate Ms. ▓▓▓'s employment. The OPD notified the Department of General Services ("DGS") security that Ms. ▓▓▓ was banned from the office at 201 St. Paul Place as well as all other offices of the OPD in Baltimore City, and sent a photograph of Ms. ▓▓▓ to DGS for posting at the security

10

station at 201 St. Paul Place.[1] Michael Rose, DGS Regional Manager, advised the OPD in an email that he could "send this to the capitol police and they can probably put a BOLO up." Ms. Kouneski also credibly testified that the OPD decided to prevent Ms. ▮▮▮ from entering any courthouse in Baltimore City.

Another action taken by the OPD as a result of the decision to terminate Ms. ▮▮▮'s employment was the filming of the removal of Ms. ▮▮▮'s personal effects from her office. The filming took place during regular business hours with the door to her office left open. The attorneys supervising the removal can be heard narrating each item identified as belonging to Ms. ▮▮▮, expressing safety concerns, and openly mentioning Ms. ▮▮▮'s name. The voices of the attorneys can be heard speaking with the supervisors and in the background. Ms. ▮▮▮ credibly described the filming as if her office was a crime scene.

Ms. ▮▮▮ credibly testified that five months after the termination of her employment, she was approached by a friend and was told of a conversation that the friend had with an OPD attorney. When the friend mentioned that she knew Ms. ▮▮▮ the OPD attorney said that Ms. ▮▮▮ "was actually fired" because the OPD "found something in [her] desk and that it was severe enough that [she] had to be fired."

Because of (1) the above disclosures and communications by the OPD to third parties and (2) the actions of the OPD revealing the circumstances of Ms. ▮▮▮'s termination to its own employees, who in turn communicated that information to other individuals, the Hearing Officer concludes, and so finds, that the OPD publicized false information that was damaging to Ms. ▮▮▮'s reputation.

## CONCLUSIONS OF LAW

▮▮▮ was employed by the OPD as a law clerk under an "at-will" employment contract. Under the express terms of the contract, the OPD was entitled to terminate the contract at any time "in its sole discretion and without cause." On March 18, 2024, the OPD exercised its right to terminate ▮▮▮'s employment contract.

---

[1] It is unclear from the evidence whether Ms. ▮▮▮'s photograph was sent to DGS security stations at other buildings that housed OPD offices.

11

Nevertheless, because ▆▆▆▆▆ was employed by the OPD, a government agency, she has a constitutionally protected liberty interest in her reputation. "An employee's liberty interest may also be implicated when a dismissal is accompanied by charges that might damage the employee's reputation in the community and the employee is given no opportunity to respond." Samuels v. Tschechtelin, 135 Md. App. 483, 530-31 (2000) (internal quotation marks omitted). The charges leveled against ▆▆▆▆▆ by the OPD that led to the termination of her employment are of the character that would damage her reputation in the community, and the OPD never gave her an opportunity to respond. Consequently, this Name Clearing Hearing was held to give ▆▆▆▆ Kramer the opportunity to refute the charges and clear her name.

The OPD leveled three charges against ▆▆▆▆ Kramer that led to the termination of her employment: (1) she possessed three unfired hollow point bullets in her desk on OPD office property; (2) she "stalked" an OPD attorney; and (3) she posed a potential threat of violence against that attorney or other OPD employees. For the reasons set forth in the Findings of Fact above, the Hearing Officer has found that each and every charge against ▆▆▆▆▆ is baseless. Therefore, ▆▆▆▆▆ has sustained her burden of proof to refute those charges. Accordingly, the Hearing Officer holds that ▆▆▆▆▆'s name has been cleared.

The OPD claims that ▆▆▆▆▆'s employment records do not contain stigmatizing information and that she is not foreclosed from employment opportunities in the legal profession. The OPD, however, overlooks the requirement for admission to the Maryland Bar that ▆▆▆▆ Kramer pass an examination of her character. She must submit a Bar Admission Character Questionnaire that requires her to list her employment and internship at the OPD. The Bar Examiners will send a Certification as to Employment to the OPD inquiring as to whether ▆▆▆▆ ▆▆▆▆ was "terminated/fired," and if so, the reason, including three separate specific inquiries about adverse conduct or behavior regarding performance on the job or conduct or behavior "raising significant concerns" about character or fitness or practice law, and concluding with "would you rehire the applicant if given the opportunity." Even without the stigmatizing information in ▆▆▆▆▆'s personnel records, as claimed by the OPD, it is unclear how the OPD will respond to the questions posed in the Certification as to Employment. In addition, ▆▆▆▆▆ will have to grant unfettered access to the Bar Examiners to inspect all records from employers, "every police department," and "every other person, firm, officer, corporation,

12

association, organization, or institution, public or private," for records, documents, and information pertaining to "good moral character and fitness to perform the responsibilities of an attorney," and "to give full and complete testimony."

Finally, the OPD claims that █████████'s reputation has not been damaged by the OPD. The Hearing Officer disagrees. The Hearing Officer has found that the OPD published false information to third parties damaging to ████████'s reputation and that the OPD revealed the circumstances of the termination of ████████'s employment to its own employees, who in turn communicated that information to other individuals. Therefore, the Hearing Officer concludes that specific relief must be granted to ████████ to mitigate the damage caused by the OPD to her reputation. Accordingly, the Hearing Officer will grant the following relief:

1. OPD must undertake all measures necessary in order to reverse the measures it implemented and retract any communications it issued to third parties, including but not limited to, banning ████████ from all OPD buildings and courthouses.
2. OPD must undertake all measures necessary to ensure the removal and retrieval of ████████'s photograph from security posts and from all agencies and locations to which it was disseminated.
3. OPD must undertake all measures necessary to seek the cancellation and removal of any BOLO that may have been issued by the Maryland Capitol Police with respect to ████████, as well as from any other agencies to whom a BOLO was communicated.
4. OPD must issue and disseminate a retraction and corrective statement to all third parties to whom it communicated about ████████ stalking, posing a danger, possessing bullets, or engaging in criminal behavior, including but not limited to: UB Law School, the OPD workforce, and all Maryland agencies involved, including, but not limited to, the Department of General Services and Maryland Capitol Police, and the Sheriff's Office. The retraction and corrective statement must include that ████████ was a good and successful employee of the OPD, that she did not engage in any wrongdoing or misconduct, and that she did not ever and does not pose a danger, nor did she engage in stalking behavior, possess bullets, or engage in criminal behavior. Each statement must

be specifically written to correct and retract any and all particular adverse statements made about ███████ to that third party.

5. OPD must purge its files of all documentation stating or relating to the assertion that the bullets found in March 2024 in the desk assigned to ███████ at the OPD were possessed by her. (All such documentation remains subject to the May 22, 2024 Litigation Hold notice and must be retained in the possession of OPD counsel.)

6. OPD must purge its files of all documentation stating or relating to the assertion that ███████ stalked OPD attorney Matt Connell, that she engaged in criminal conduct, and that she threatened or posed a potential threat to OPD attorney Matt Connell or to any OPD employee. (All such documentation remains subject to the May 22, 2024 Litigation Hold notice and must be retained in the possession of OPD counsel.)

7. OPD must provide contemporaneous and ongoing reporting of its implementation of these requisite measures, along with full access to counsel for ███████ of all information necessary to monitor and ensure all these requisite measures are undertaken and in a form sufficient to ensure the maximum comprehensive efforts to correct and retract each adverse statement made about ███████ to third parties.

8. OPD must affirmatively communicate to the Maryland State Board of Law Examiners that ███████ performed her job well, that she was on track for permanent hire, and that she was fired without any basis. OPD must refrain from communicating to the Maryland State Board of Law Examiners that ███████ engaged in any wrongdoing or misconduct, that she stalked OPD attorney Matt Connell, that bullets found in the desk assigned to ███████ at the OPD were possessed by her, that she engaged in criminal conduct, or that she posed a potential threat of violence or danger to OPD attorney Matt Connell or to any OPD employee.

9. OPD must refrain form communicating with prospective employers that ███████ engaged in any wrongdoing or misconduct, that she stalked OPD attorney Matt Connell, that bullets found in the desk assigned to ███████ at the OPD were possessed by her, that she engaged in criminal conduct, or that she posed a potential threat of violence or danger to OPD attorney Matt Connell or to any OPD employee.

10. OPD must refrain from communicating with any third parties that ███████ engaged in any wrongdoing or misconduct, that she stalked OPD attorney Matt Connell,

14

that bullets found in the desk assigned to ███████ at the OPD were possessed by her, that she engaged in criminal conduct, or that she posed a potential threat of violence or danger to OPD attorney Matt Connell or to any OPD employee.

11. OPD must cooperate fully in all additional measures that become necessary with respect to ███████'s application for admission to the Maryland State Bar, applications to any other states' bar, applications for employment, applications for security clearances, and any other circumstances in which the history of OPD's false charges creates a potential impediment to ███████'s access to licensure, employment, or other lawful rights.

November 27, 2024
Date

*Patrick L. Woodward*
Hon. Patrick L. Woodward (Ret.)
Hearing Officer

### CERTIFICATE

I hereby certify that a copy of the Hearing Officer's Decision was forwarded to counsel via email this 27th day of November, 2024.

*Patrick L. Woodward*
Hon. Patrick L. Woodward (Ret.)
Hearing Officer